**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**(Roanoke Division)**

| | |
|---|---|
| DANIEL PALMER, et al. | ) |
| *Plaintiffs,* | ) |
| v. | ) Case No. 7:26-cv-00260-EKD-CKM |
| | ) |
| VIRGINIA HIGH SCHOOL LEAGUE, INC., et al. | ) |
| *Defendants.* | ) |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMIANRY INJUNCTION**

In the Roanoke County Public School (RCPS) system, students who attend public schools entirely from home in a virtual learning environment, and even private school students, are welcomed to participate in RCPS's athletics events. However, if a student is a home school student—even if doing so for religious reasons—that ends the discussion. Home schooled highschoolers are categorically excluded from participating in public-school sports.

Consequently, ninth-grade student Plaintiff S.P., who is home schooled primarily for religious (and also for medical) reasons, currently is barred from RCPS athletics because he is home schooled. This has harmed Plaintiff most particularly by removing meaningful opportunities for him to participate in track & field and cross country competitive running and to pursue college scholarships through competitive running, and by reducing his ability to manage his unique neuropsychiatric condition that is helped through competitive running.

Defendants' policy of excluding S.P. and all home school students from public school sports violates the Equal Protection Clause of the Fourteenth Amendment, Section 16 of Article I of the Virginia Constitution, and the Virginia Religious Freedom Restoration Act. Because of this, as set out below, Plaintiffs' Motion for a Preliminary Injunction against this bar should be granted.

1

## **BACKGROUND**

a.   The Palmers and Home Schooling

Home schooling is an abundantly popular form of education in Virginia today.  More than 66,000 grade-school students in Virginia are educated in this fashion.  Dkt. 1, ¶ 16.

To home school, a parent must satisfy multiple statutorily-mandated requirements. A parent must: (i) demonstrate ability to provide home instruction for the child, (ii) annually notify the local school division of intent to provide home instruction, (iii) annually provide a description of the curriculum to be administered, and (iv) annually provide evidence of the child's appropriate academic achievement, such as a composite score in or above the fourth stanine on a nationally normed standardized achievement test.  Va. Code § 22.1-254.1.  Virginia law declares that, if a parent complies with these requirements, home schooling is "an acceptable alternative form of education."  *Id.*

Plaintiff S.P. is a ninth-grade student residing in Roanoke County, Virginia.  Dkt. 1, ¶ 14. Since 2016, his parents, Plaintiffs Daniel and Stacie Palmer, have educated S.P. at home, always complying with these statutory requirements.  *Id.* at ¶ 22.  They are excellently situated to home school.  S.P.'s mother, his primary home school teacher, holds a bachelor's degree in early childhood education from Virginia Tech, holds a graduate-level gifted education endorsement from the University of Virginia, and was licensed to teach in public schools for 11 years.  *Id.* at ¶ 30.  Similarly, S.P.'s father, his secondary instructor, holds a bachelor's degree in history and political science from Virginia Tech, a master's degree in public administration from Virginia Tech, and a master's degree in Biblical languages from Southeastern Baptist Theological Seminary.  *Id.* at ¶ 31.

The Palmers annually apprise RCPS of their intent to home school S.P., their education-related credentials, a description of their intended curriculum, and evidence of S.P.'s academic achievement. *Id.* at ¶ 21. S.P.'s ninth-grade curriculum includes a well-selected assortment of eight distinct subjects: algebra I with geometry, Spanish I, economics, U.S. government, English, logic, integrated chemistry and physics, and piano. Similarly, S.P.'s academic performance has been excellent. *Id.* at ¶ 23. In June 2025, for example, on the California Achievement Test ("CAT")—a standardized test that is nationally recognized—S.P.'s results reported his reading, math, and language achievement as each being in the 98th percentile or above, and his having achieved a grade equivalent level of 13.6 in all subjects. *Id.* at ¶ 29.

The primary reason for the Palmers home schooling S.P. is their religious beliefs as Bible-believing Christians. *Id.* at ¶ 32. They believe educating S.P. at home provides them the best opportunity for him to learn, process, and assimilate content in ways that are consistent with and not contrary to his faith. They further believe sending S.P. to public school would expose him to worldviews, assumptions, and educational philosophies that are contrary to their faith. They believe God will judge their efforts as parents and educators of their children, and that home schooling is the way they can best steward their responsibility for S.P. They further believe they have a duty to raise their child in the nurture and admonition of the Lord. Their religious beliefs lead them to home school their children because they believe it provides the best opportunity for them as parents to incorporate the Bible and Christian discipleship throughout the day, which they believe is commanded in Scripture (e.g., Deuteronomy 6 and Proverbs 22:6). *Id.*

A secondary reason for the Palmer's home schooling S.P. is his unique PANS/PANDAS condition. This condition causes sudden onset of neuropsychiatric symptoms like obsessive compulsive disorder, tics, anxiety, and behavioral changes in children, typically

3

triggered by infections.  Home schooling allows the Palmers to adapt to and manage the effects of S.P.'s condition in a fashion that is beneficial for him.  *Id.* at ¶ 49.

    b.  <u>Track & Field and Cross Country</u>

Throughout his youth, S.P. has developed a passion and skill for track & field and cross country distance running.  *Id.* at ¶ 35.  In his middle school years, he competed in many such meets and events both as an individual runner and as part of a home school track team.  *Id.* at ¶ 36.  Those meets included competitions against RCPS teams.  For example, in the eighth grade, S.P. competed as a home school student in the Cosmopolitan Invitational Track & Field Meet in May 2025, a VHSL-sanctioned public school track meet held at William Fleming High School in Roanoke, Virginia.  Likewise, as a middle school student, S.P. competed against public school students in track & field and cross country events including invitationals hosted at public high schools in Roanoke and Blacksburg, Virginia, and an invitational held at a public middle school in Roanoke, Virginia.  *Id.* at ¶¶ 36, 39, 40.

Defendants VHSL and RCSB knew that S.P. was home schooled when they allowed him to compete in VHSL-sanctioned track & field and cross country meets and invitationals as a middle school student.  *Id.* at ¶ 42.  Being home schooled, he was able to compete "unattached"—meaning he competed individually, without a team affiliation or as part of a home school team of runners.  *Id.* at ¶ 43.  This created no problem.

However, when S.P. entered the ninth grade, everything changed.  At that point, RCPS excluded S.P. from its public school track & field and cross country competition events simply because of his status as a home schooled student.  *Id.* at ¶ 56.

RCPS is a member of Defendant Virginia High School League (VHSL), an organization that governs interscholastic sports and academic competitions for every Virginia public high

school, and even some of Virginia's private high schools, by setting standards, implementing rules including eligibility requirements, and organizing statewide competitions in numerous athletic activities. Among the sports VHSL regulates are track & field and cross country. *Id.* at ¶¶ 7, and 5.

Importantly, VHSL is comprised of and governed by government entities and representatives who agree to uphold its rules. Based on its nature and composition, VHSL is a state actor, and its actions are subject to constitutional restrictions. *Id.* at ¶¶ 5 and 6 (citing *McGee v. Va. High Sch. League, Inc.*, No. 2:11-cv-35, 2021 U.S. Dist. LEXIS 110270 (W.D. Va. Sept. 28, 2011).

RCSB participates in and enforces VHSL's rules for students competing in interscholastic high school athletics, including track & field and cross country. Consequently, it carries out VHSL's policy of prohibiting S.P., and all home school students, from participating in VHSL-approved athletics. Dkt. 1 at ¶ 7.

Defendants' intent to exclude home school students is clear. VHSL's Policy Manual (Relevant excerpts from Manual are attached as Exhibit 1) first acknowledges that, like private schooling, home schooling satisfies "Virginia Code compulsory education requirements." *Id.* at ¶ 24 (citing VHSL's 2025–26 Handbook and Policy Manual § 28A-3-3 (hereafter "Manual")). Its Manual further provides that "[h]ome schooling is the equivalent of school enrollment for purposes of [some] future eligibility requirements," including VHSL's requirement that students' have maintained successful academic performance in their most recent prior school semester (referred to as VHSL's Scholarship Rule). *Id.* at ¶ 24 (citing Manual § 28A-3-3).

Despite this, however, by policy, VHSL excludes any home schooled student from participating in any VHSL-sponsored interscholastic athletic competitions, including track & field

5

and cross country, regardless of the reasons for home schooling or the individual circumstances of the student (hereafter "exclusionary policy")  *Id.* at ¶ 52.  VHSL's Manual states this directly: "[h]ome school students are not eligible" to participate in a public school athletics team.  *Id.* at ¶ 54 (citing Manual § PM 28A-2-3).  VHSL's exclusionary policy prohibits home school students from trying out for, practicing with, or competing with their local public high school team.  Thus, unsurprisingly, in August 2025, when S.P.'s father sought to admit S.P. into public-school sports at the high school level, he was informed by a VHSL representative that home schooled students were not allowed to compete in VHSL-sanctioned events.  *Id.* at ¶ 56.

VHSL's requirement that only public-school students compete in VHSL-sanctioned events and only on behalf of the public school they attend has multiple significant exceptions:

- VHSL allows private school students to participate in interscholastic high school athletic competitions.  *Id.* at ¶¶ 58–59 (citing Manual § 27-14-1).

- Students who attend public school 100% virtually at home may participate in VHSL-sanctioned athletics.  *Id.* at ¶ 62 (Manual § 28A-7-3).

- For students who attend Virginia's Governor's Schools that do not offer a student's desired sport, VHSL's policies establish that those students may participate in that sport at the public school associated with their residence. *Id.* at ¶ 60 (Manual § PM 28A-2-3(1)).

- VHSL allows VHSL-member schools to compete in interstate athletic competitions against teams from other states whose athletic associations allow home schooled students to compete on those teams. *Id.* at ¶ 63 (Manual § 27-5).

Yet despite these many exceptions, Virginia home schooled students are banned from public school sports.

Because Defendants exclude S.P. from participating in its track & field and cross country sports, S.P. is restricted in numerous ways.  Access to MileStat.com is a key example. MileStat.com serves as the exclusive system used by VHSL—and the primary and most comprehensive database used by college coaches—for scouting, recruiting, and verifying

performances in high school track & field and cross country in the United States. *Id.* at ¶¶ 44–46. S.P. aspires to become a college runner after high school and to earn a scholarship for track & field and/or cross country. *Id.* at ¶ 47. However, without the ability to participate in competitive events sanctioned by VHSL, S.P.'s ability to log official running times that can be verified and viewed by colleges is greatly reduced, severely limiting his ability to prove his running abilities to college recruiters. *Id.* at ¶ 46.

Likewise, without access to VHSL-sanctioned running events, S.P. has no practical way to engage in competitive running in track & field or cross country with his peers. *Id.* at ¶ 48.

Furthermore, while competitive running has been a huge part of S.P.'s fight for health related to his PANS/PANDAS condition, which his doctors have advised him to continue, Defendant's exclusionary policy has taken this opportunity away from S.P. *Id.* at ¶¶ 49–50.

## <u>ARGUMENT</u>

A party seeking a preliminary injunction must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Where there are multiple claims advanced, "finding a likelihood of success on only one claim is sufficient to justify injunctive relief." *Salomon & Ludwig, LLC v. Winters*, 2025 WL 2314652 at *3 (4th Cir. Aug. 12, 2025).

As addressed below, Plaintiffs meet all four factors to obtain a preliminary injunction. Most importantly, Plaintiffs are likely to prevail on the merits of their claims that Defendants' exclusionary policy violates their rights to equal protection (Complaint Count I) and religious freedom (Complaint Counts II and III).

### I.      Plaintiffs Are Likely to Prevail on the Merits.

a. Count I: Equal Protection

Plaintiff is likely to succeed on his Equal Protection Clause claim.  S.P. is similar to his public-schooled and private-schooled peers in every relevant respect except for one: he is home schooled.  For this sole reason, Defendants deny S.P. any opportunity to participate in public school athletic programs like track & field and cross country.  Defendants' decision in this regard cannot satisfy rational basis scrutiny, therefore it violates the Equal Protection Clause.

As a threshold matter, it is settled that Defendants are state actors subject to liability for constitutional violations under 42 U.S. Code § 1983.  VHSL's status as a state actor was recognized by this Court in *McGee*, 2021 U.S. Dist. LEXIS 110270 (regarding VHSL).  *See also* Va. Code § 22.1-71 (regarding RCPS).

As for the merits of an equal protection claim, a plaintiff asserting such a claim as a member of a non-suspect class must show that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).  If this showing is made, the court then determines whether the differential treatment is justified under the requisite level of scrutiny.  *Id.*  For non-suspect class members, a plaintiff must show that the challenged classification is not "rationally related to a legitimate state interest."  *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008).

Analysis of this nature was illustrated in the *Giarratano* case cited above. There, a plaintiff, who was a prisoner, brought an equal protection challenge to the provision of Virginia's Freedom of Information Act that excluded prisoners from availing themselves to the rights protected under that law. *Giarratano*, 521 F.3d 298. The court applied rational basis scrutiny and found the prisoner's claim wanting. *Id.*

The circumstances here are the opposite, however. Defendants' policy of excluding home school students from public school sports—when they receive private school and even virtual school students into their athletics programs—cannot be justified even under rational basis review.

Plaintiff's substantiation of the first portion of the equal protection analysis is plain enough. Defendants exclude S.P. from public school sports because he is home schooled. Nothing else materially distinguishes S.P. from his public-schooled peers, or his private-schooled peers. For example, academically, he performs exceptionally, and his current course load includes 8 distinct academic subjects, Dkt. 1, ¶¶ 29 and 23, which exceeds the 5-subject requirement propounded by VHSL, *id.* at ¶ 24. Therefore, S.P. is similarly situated to those peers.

Also, Defendants' exclusionary policy is entirely intentional. VHSL's Manual (§ PM 28A-2-3) specifically directs that "[h]ome school students are not eligible" to participate in a public school athletics team. Therefore, the only question remaining is whether Defendants' exclusionary policy is rationally related to a legitimate state purpose. Because it is not, it should be enjoined.

It is hard to imagine how Defendants' propose to justify their exclusionary policy, and Plaintiffs anticipate rebutting all such proposed justifications that Defendants eventually present. However, Plaintiffs anticipate Defendants will present at least three arguments, each of which should fail.

First, Defendants might argue that their exclusionary policy preserves an "all-or-nothing" school environment, saying that students should not be able to obtain some benefits while eschewing the burdens incident to public school.  This argument, however, stumbles from the start. VHSL already allows private schools (Manual § 27-14-1) and students who attend public school 100% virtually at home (Manual § 28A-7-3) to participate in VHSL-sanctioned athletics.  Again, for students who attend Virginia's Governor's Schools that do not offer a student's desired sport, VHSL's policies establish that those students may participate in that sport at the public school associated with their residence. Manual § PM 28A-2-3(1). Also, VHSL allows VHSL-member schools to compete in interstate athletic competitions against teams from other states whose athletic associations allow home schooled students to compete on those teams. Manual § 27-5. These many exceptions make clear: there is nothing intrinsic about public school enrollment or attendance at the specific public school that is rationally related to a policy to exclude those who do not take on all the commitments of enrollment in that specific, or any other, public-school.

Second, Defendant might argue that their exclusionary policy exists to further a fairness interest in preventing unenrolled students from taking a public school student's spot on a public-school team.  However, this argument conceives of a sense of "fairness" that is neither objective, nor legally cognizable.  Home school students, like S.P., are entitled to enroll in the public school where they reside, as a matter of law.  Virginia Constitution Article VIII, Section 1 makes this clear by requiring Virigina government to "provide for a system of free public . . . schools for all children of school age throughout the Commonwealth."  Indeed, S.P.'s parents pay taxes that support the existence of the RCPS system even though they personally are religiously led to home school.  The fact that S.P.'s parents, owing no fault to himself, are educating S.P. by another

10

means—as is their right—does not thereby strip S.P. of all benefits otherwise offered and to be enjoyed by all students living within RCPS' geographical lines.

Indeed, RCPS already permits home school students to attend some public-school classes through part-time public school enrollment. Dkt. No. 1, ¶ 64 (citing "Part Time Instruction," RCPS, https://www.rcps.us/academy/rcpsonline-academy/part-time-instruction (last visited Mar. 27, 2026)). Additionally, for home schooled students wishing to compete on their local high school's team, home school students would only be guaranteed the right to try out for a team, just like anyone else—not to necessarily take a spot on the team.

But even if all these points were cast aside, one more point is crucial: for home school students such as S.P. who wish to compete in track & field and cross country as "unattached" (unaffiliated with a particular team), this rationalization simply has no conceivable application. Such home schooled students would not be taking any public school athlete's position at all. Therefore, at least in S.P.'s circumstances, Defendants cannot defend its exclusionary policy based on this rationalization. And importantly, the Supreme Court has made clear that if a court can resolve a case under the direct circumstances of the Plaintiff, rather than making unnecessarily broad constitutional judgments, it should. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (asserting that, when the circumstances of the particular Plaintiff are sufficient to resolve an equal protection question in his favor, that should resolve the issue).

Third, Defendants might argue that their exclusionary policy avoids a conflict arising from different academic standards, saying that in order to play sports, home school students are not subject to the same academic qualifications that public school students are subjected to because public-school athletes typically have to meet minimum course and grade requirements in order to remain on their sports teams. However, this argument could not be viewed as rationally related to

11

a legitimate state interest.  First, it is hard to accept this argument when the Virginia General Assembly has already established the expectations it has for home school students to prove their academic performance.  Va. Code § 22.1-254.1 (describing various methods for proving academic performance including standardized test results showing the student performs at or above the fourth stanine of such achievement test).

Beyond that point, a categoric ban of all home school students to avoid academic non-performance presents as nothing more than a fear-driven pretextual and prejudice-driven concern that lacks serious rationality of the nature eschewed in *City of Cleburne*, 473 U.S. at 449 (stating that while governments have broad latitude under rational basis review, categorization based on references to the community's "vague, undifferentiated fears" are constitutionally problematic because doing so "permit[s] some portion of the community to validate what would otherwise be an equal protection violation.").

Finally, for S.P., this academic-performance concern is entirely inapplicable because his academic performance is excellent.  This is reflected in his California Achievement Test results from 2025 which show him as being in the 98th percentile or above in reading, math, and language, and having a grade equivalent level of 13.6 in all subjects.  Because the Plaintiff's particular facts control in equal protection analysis, *City of Cleburne*, 473 U.S. at 448, justification of Defendants' exclusionary policy using this rationalization should fail.

In sum, Plaintiffs are aware of no rationalization that Defendants could proffer that would satisfy Equal Protection Clause review.  Defendants' exclusionary policy clearly discriminates against home school students like S.P., yet it cannot be justified as being rationally related to any legitimate state purpose.  Therefore, it should be enjoined.

b.  Count II: Virginia Constitution Free Exercise Claim

Plaintiffs also are likely to succeed on their Virginia Constitution Free Exercise claim. Defendants' policy burdens Plaintiffs' home schooling of S.P., which is a religiously motivated practice for Plaintiffs, yet Defendants cannot prove that this religious practice will result in the substantial threat to public safety, peace, or order contemplated by Virginia Constitution Article I, Section 16.  Therefore, Defendants' exclusionary policy, again, should be enjoined.

Virginia Constitution Article I, Section 16 states:

[A]ll men are equally entitled to the free exercise of religion, according to the dictates of conscience," and "[n]o man . . . shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but all men shall be free to profess and by argument to maintain their opinions in matters of religion, and the same shall in nowise diminish, enlarge, or affect their civil capacities.

This constitutional provision creates a free-standing, enforceable cause of action.  *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 530 (2023) (holding that a plaintiff had set out in his complaint a viable claim under Va. Const. art I, § 16); *Ibanez v. Albemarle Cty. Sch. Bd.*, 80 Va. App. 169, 191–92 (2024) (observing that Vlaming implicitly found Va. Const. art. I, § 16 to be self-executing).

In 2023, the Virginia Supreme Court held that this clause of the Virginia Constitution is vastly more protective of religious practice than the First Amendment to the U.S. Constitution as conceived of in *Employment Division v. Smith*, 494 U.S. 872, 878–79 (1990), which held that a law need only be neutral and generally applicable to survive Federal Free Exercise Clause review.

For the Virginia Constitution, however, the Virginia Supreme Court directly repudiated *Smith*, saying: "In our opinion, the federal *Smith* doctrine is not and never has been the law in Virginia, and its shelf life in the federal courts remains uncertain." *Vlaming*, 302 Va. 504, 530.

The Virginia Supreme Court has explained that Virginia state actors may not burden a person's free exercise of his religion except under extremely limited circumstances.  Indeed, the government must prove that the religious beliefs being burdened are of such a nature that they would cause the person "to commit overt acts that invariably posed some substantial threat to public safety, peace or order."  Further, the government must prove that if this were true, that the government's compelling state interest in protecting the public from that threat, when examined under the rigors of strict scrutiny, could not be satisfied by less restrictive means.  *Id.* at 540.  Also, the Court explained that this Constitutional right "establishes the duty of government to accommodate religious liberties."  *Id.* at 537.

Here, the Palmers' religious beliefs as Bible-believing Christians constitute the primary reason for why they home school S.P.  They believe educating S.P. at home provides them the best opportunity for him to learn, process, and assimilate content in ways that are consistent with and not contrary to his faith.  They further believe sending S.P. to public school would expose him to worldviews, assumptions, and educational philosophies that are contrary to their faith. They believe God will judge their efforts as parents and educators of their children, and that home schooling is the way they can best steward their responsibility for S.P. They further believe they have a duty to raise their child in the nurture and admonition of the Lord. Their religious beliefs lead them to home school their children because they believe it provides the best opportunity for them as parents to incorporate the Bible and Christian discipleship throughout the day, which they believe is commanded in Scripture (e.g., Deuteronomy 6 and Proverbs 22:6).  Dkt. 1 ¶ 32.

Defendants' exclusionary policy burdens this aspect of Plaintiffs' religious practice in numerous ways.  It deprives S.P. of the opportunity of competing in public-school sports.  It particularly denies S.P. from participating in track & field and cross country.  It minimizes S.P.'s

ability to pursue collegiate track athletic scholarship by removing his ability to record his running accomplishments on the MileStat platform primarily used by college recruiters. Also, it removes a key method for S.P.'s management of his PANS/PANDAS condition which is helped through the competitive track & field and cross country environment. Each of these are significant and burdensome consequences inflicted upon Plaintiffs' religious beliefs through Defendants' exclusionary policy.

Thus, because Defendants' policy burdens Plaintiffs' religious practice, Defendants are required to justify their exclusionary policy by showing Plaintiffs' relevant religious beliefs cause them "to commit overt acts that invariably posed some substantial threat to public safety, peace or order," and "if so, whether the government's compelling state interest in protecting the public from that threat, when examined under the rigors of strict scrutiny, could be satisfied by 'less restrictive means.'" *Vlaming*, 302 Va. at 540. Emphatically, this is a showing Defendants could never make.

c. Virginia Religious Freedom Restoration Act

Again, Defendants' exclusionary policy should be enjoined pursuant to Virginia's Religious Freedom Restoration Act (VRFRA). This statute contains a "core provision" which establishes a "general rule and a narrow exception." *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 559–60 (2023). First, "[t]he general rule states that '[n]o government entity shall substantially burden a person's free exercise of religion even if the burden results from a rule of general applicability.'" *Vlaming*, 302 Va. 504, 559–60 (quoting Va. Code § 57-2.02(B). A plaintiff alleging a VRFRA claim holds the initial obligation "to show that the government 'substantially burden[ed]' the 'free exercise of religion,' [citing Va. Code § 57-2.02(B)], which includes any act that 'inhibit[s] or curtail[s] the 'religiously motivated practice,'" *Vlaming*, 302 Va. at 560 (citing Va. Code § 57-2.02(A)).

15

Then second, VRFRA's narrow exception sets out that "a violation of the general rule will only be excused if the government 'demonstrates that application of the burden to the person is (i) essential to further a compelling governmental interest and (ii) the least restrictive means of furthering that compelling governmental interest.'" *Id.* at 560.  Governments seeking to prove that the statutory exception applies must prove this by clear and convincing evidence.  *Vlaming*, 302 Va. at 560 (citing Va. Code § 57-2.02(A)).  Importantly, "'[t]he least-restrictive-means standard is exceptionally demanding,' and it requires the government to 'show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party.'" *Vlaming*, 302 Va. 561 (quoting *Holt v. Hobbs*, 574 U.S. 352, 364–65 (2015)).  "This highly 'focused' evidentiary analysis 'requires the [g]overnment to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Vlaming*, 302 Va. 561 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014)).

Plaintiffs amply satisfy the core provision of VRFRA just as they satisfy the religious burden aspect of their Virginia Constitution Religious Freedom claim (analyzed above).  By applying their exclusionary policy against Plaintiffs, Defendants inhibit or curtail Plaintiffs' religiously motivated practice, causing them to endure significant losses for continuing their religious practice.

With Plaintiffs having made this showing, this flips the burden to Defendants.  They must show—by clear and convincing evidence—that application of this burden to Plaintiffs is "(i) essential to further a compelling governmental interest and (ii) the least restrictive means of furthering that compelling governmental interest.'" *Id.* at 560.  Making this showing is Defendants' burden.

16

However, no compelling state interest exists to justify Defendants' exclusionary policy, especially as it is applied to S.P.  Particularly, his academic performance is superb, so academic achievement concerns cannot justify the policy.  Also, S.P. seeks to participate in public-school track & field and cross country competitions, which can be done either on a public school team or unattached (unaffiliated with a particular team), which would cause no disruption at all. Defendants cannot make out the weighty showing required under VRFRA to justify its burdening of Plaintiffs' religious beliefs.  Therefore, Defendants' exclusionary policy applied to S.P. should be enjoined.

## II.      Without Relief, Plaintiffs Will Suffer Irreparable Harm.

Plaintiffs will suffer irreparable injury absent preliminary injunctive relief. "The denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v. Meese,* 818 F.2d 1132, 1135 (4th Cir. 1987).  Similarly, the denial of rights protected under VRFRA should be viewed as creating irreparable harm.  *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 376 (N.D. Tex. 2021) ("Christian Plaintiffs contend that violation of their statutory rights under RFRA is an irreparable harm. The Court agrees.").  Absent a preliminary injunction, Plaintiffs' right to equal protection will remain denied and their religious beliefs will continue to be burdened, inhibiting S.P.'s competitive running engagement and collegiate aspirations and forcing S.P. to continue to contend with his PANS/PANDAS condition with out the help that competitive running provides.

## III.     The Balance of Equities Favors the Plaintiffs.

Because Defendants are state actors, these third and fourth requirements for a preliminary injunction—are "established when there is a likely First Amendment violation." *Centro Tepeyac*, 722 F.3d at 191.  Here, Plaintiffs have raised serious questions about Defendants' exclusion of

S.P. from public school athletics and the resultant burdens on their rights to religious free exercise and equal protection.  If Defendants' exclusionary policy remains in force during the pendency of this litigation, it will continue to interfere with S.P.'s ability to engage in track & field and cross country well into his tenth grade year or possibly even beyond, seriously damaging his ability to pursue future track & field and cross country opportunities and reducing his ability to manage his PANS/PANDAS condition.

Conversely, the School Board "is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (cleaned up); *accord Centro Tepeyac*, 722 F.3d at 191. Thus, the harm suffered by the Plaintiffs if a preliminary injunction is denied far outweighs the harm, if any, suffered by Defendants if a preliminary injunction is granted to permit S.P. to compete during this litigation.

### IV.      Public Interest Favors the Plaintiffs.

Finally, upholding the Constitution always promotes the public interest. *Giovani Carandola*, 303 F.3d at 521 ("upholding constitutional rights surely serves the public interest."). When courts "protect the constitutional rights of the few, it inures to the benefit of all." *Int'l Refugee Assistance Proj. v. Trump*, 857 F.3d 554, 604 (4th Cir. 2017), *vacated as moot*, 583 U.S. 912 (2017).  Plaintiffs seek only to continue their religiously motivated practice of home schooling while enabling S.P. to participate in public-school track & field and cross country during his high school years.

### CONCLUSION

For the foregoing reasons, Plaintiffs, by and through counsel, respectfully request that this Court issue the Preliminary Injunction requested in the accompanying motion.

18

Dated: March 30, 2026                    Respectfully Submitted,


                                         **DANIEL PALMER, STACIE PALMER, and
                                         S.P., by his parents and next friends, DANIEL
                                         and STACIE PALMER
                                         By Counsel:**

                                          /s/ Michael B. Sylvester
                                         Joshua A. Hetzler, Esq. (VSB No. 89247)
                                         Michael B. Sylvester, Esq. (VSB No. 95023)
                                         FOUNDING FREEDOMS LAW CENTER
                                         707 E. Franklin Street
                                         Richmond, VA 23219
                                         Telephone: (804) 971-5509
                                         josh@foundingfreedomslaw.org
                                         michael@foundingfreedomslaw.org
                                         *Counsel for Plaintiffs*

19